# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 15, 2014 Session

## IN RE:  A-ACTION BONDING COMPANY

**Appeal from the Circuit Court for Maury County**
**No. B-100     Robert L. Jones, Stella L. Hargrove, Jim T. Hamilton,**
**and Robert L. Holloway, Judges**

---

**No. M2013-01526-CCA-R3-CD - Filed October 15, 2014**

---

This is an appeal by A-Action Bonding Company of Columbia ("A-Action") of an order of the Maury County Circuit Court, sitting *en banc*, which suspended the bonding authority of the company, its principal, and one of its agents based on its finding that the agent solicited an inmate at the county jail, in violation of Tennessee Code Annotated section 40-11-126(6). The appellant argues that the court improperly considered as evidence a cell phone recording of a videotaped conversation between the agent and the inmate when the original jail videotape had been destroyed and the cell phone recording was made by a competitor and contained an altered version of the original. We agree. We also agree that, without the improperly admitted recording, there was insufficient evidence that the agent solicited business in violation of the statute. Accordingly, we reverse the judgment of the trial court and dismiss the motion to suspend the bonding authority of A-Action, its principal, and its agent.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Dismissed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Samuel L. Patterson, Columbia, Tennessee (at hearing); and Robert E. Lee Davies, Franklin, Tennessee (on appeal), for the appellant, A-Action Bonding Company.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; and Mike Bottoms, District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case stems from the actions of A-Action president, James Bloss, and A-Action employee, Debbie Farris, in having gone to the Maury County Jail to speak with an inmate who, along with a co-defendant, was being held at the jail on a murder charge. In a letter to the Maury County Circuit Court, Kendall Vandiver, President of Stoney's Bail Bonding, and Billy Hood, President of ABC Bonding, Inc., complained that A-Action had improperly solicited their client, Billy Shouse, at the Maury County Jail on February 7, 2013. They stated that they had reviewed the videotape of the jail conversation between their client and the A-Action employee and were including a copy of the videotape, along with supporting affidavits, with their complaint.

The trial court subsequently forwarded the letter and its attachments to the district attorney's office, which responded with a May 1, 2013 motion to suspend/strike from the rolls of professional bondsmen in the district James Bloss, President of A-Action Bonding, and Debbie Farris, A-Action Bonding employee, for having engaged in the unprofessional conduct of soliciting a client at the county jail.

At the evidentiary hearing, Chief Deputy Nathan Johns of the Maury County Sheriff's Department testified that Kendall Vandiver asked to view the jail's videotape of a competitor's conversation with inmate Billy Shouse. He said he viewed the videotape first, which was of Ms. Farris, Mr. Bloss, and another female in the bonding room having a conversation with Shouse, and then allowed Vandiver to view and record it on his cell phone. He stated that only Farris' and Bloss's side of the conversation was audible on the recording but that, as he recalled, it "appeared that they [were] . . . trying to get that inmate out and . . . there was some confusion as to . . . if they [were] supposed to be there or if maybe somebody else was supposed to be there." After the disc of Vandiver's cell phone recording was played, Deputy Johns agreed that it appeared to be an accurate representation of part, but not all, of the conversation contained on the original jail recording. The recording was subsequently admitted as an exhibit to the hearing.

On cross-examination, Deputy Johns testified that Vandiver contacted him about viewing the recording two or three days after the February 7 conversation between the inmate and the competitor bail bondsmen took place. He said that the jail's recording system, which was "data driven," saved videos on the computer for approximately seven to ten days. He testified that the clock visible on the bottom of the screen in the recording was fairly accurate. He described the jail's computer recording system as "pretty antiquated" and said that it recorded action in three-minute segments, which meant that "if you want to view

something, then you have to click on – you have to watch three minutes, and then the system stops, and then you have to click on the next three minute segment and then the system stops." There should not, however, have been a seven or eight-minute lapse in the recording, as was visible on Vandiver's cell phone recording, unless there was a seven or eight-minute period of time during which there was no motion in the room, as the system was "set up on motion." Finally, he testified that he had no way of knowing whether Vandiver recorded every section of the jail video on his cell phone.

Kendall Vandiver testified that on February 6 he met with Billy Shouse's father, uncle, and cousin for two to three hours about bonding Shouse out of jail. He said that when Shouse's father left his office that day, he told him that he would be back the following morning. The next morning when he returned, Shouse's father told him that he was ready "to get Billy out" but had to go to the bank to obtain the funds. Vandiver said that while he was gone, one of his agents, Candice Conner, contacted the jail to make sure there were no holds on Shouse from other counties and was told that A-Action Bonding Company "had Billy Shouse at the bonding window talking to him about getting him out of jail."

Vandiver testified that when Shouse's father returned, he told him that neither he, nor, to his knowledge, any of his family members had contacted A-Action about bonding his son out of jail. Vandiver said that his company bonded Shouse out of jail approximately an hour later. The next day, he contacted Deputy Johns to voice his concerns about A-Action's behavior. Approximately an hour later, Deputy Johns called to ask him to come to the jail to look at what he had found on the jail videotape.

Vandiver testified that he viewed the jail's videotape of the encounter at the jail and copied it on his phone. He said he heard no discussion by Bloss or Farris on the videotape "concerning getting [Billy Shouse's co-defendant] Joe Truett out of jail[.]" He stated that the video contained on the disc he submitted in connection with his complaint against A-Action was not a complete tape because he had lost one clip of the video he recorded on his cell phone. The lost clip consisted of "Farris leaning up on the glass in the bonding room, the hole that you would speak through . . . [and] whispering through that hole." According to Vandiver's testimony, it was impossible to hear what Farris was saying during the portion of the clip that had been lost. He had no idea how he had lost that particular clip and, to his knowledge, it was the only portion of the original recording that had been lost.

On cross-examination, he testified that Shouse's neighbor, Nicole Scott, had contacted one of his agents, Candice Conner, about bonding Shouse out of jail. Although Scott did not currently work for his company, he had sent her to school in order for her to be qualified to write bonds in the district. He claimed he had no knowledge of her having business cards indicating that she was a licensed bail bondsman for Stoney's Bail Bonding or of her having

advertised herself as such on her Facebook page. Finally, he testified that he watched and recorded what Deputy Johns showed him of the jail video; he had no idea how the jail recording system worked and was not controlling the system at the time he made his recording.

Candice Conner, a seven-year employee of Stoney's Bail Bonding, testified that Nicole Scott contacted her on February 6 about posting Billy Shouse's bond and later that afternoon came into the office with Shouse's father, "Baby Ray" Shouse, to fill out the appropriate paperwork. Conner said she informed Mr. Shouse that Stoney's could not write the entire bond because it exceeded their bond limits and asked if it would be all right for her to contact another company to write $100,000 of the bond. The next morning, Mr. Shouse returned to the office and made the bond. Conner testified that she and Billy Hood of ABC Bonding then went to the jail to post Billy Shouse's bond. Before making that trip, she called the jail to find out if Billy Shouse had any holds on him from other counties and learned from the booking officer that Farris was at the bond window talking to Billy Shouse about posting his bond. On cross-examination, Conner testified that Nicole Scott was a former employee of Bloss and was currently in the process of trying to get qualified as an agent of Stoney's Bail Bonding.

Ray Shouse testified that his son told him to go to Nicole Scott, a neighbor, and that she would accompany him to the bonding office to make bond. He said he stopped at an office that he thought was owned by John Toddy,[1] only to be told by the people there that Toddy had "sold out." He, therefore, sat and talked with those people and ultimately used them to make his son's bond. He could not recall their names, but later identified them at the hearing as Vandiver and Conner. On cross-examination, he testified that Vandiver and Conner told him that they had taken over Toddy's bonding company. He said he had never talked to Bloss or Farris and that neither one had ever called him.

The first defense witness, Mitzi Truett, testified that her son, Joseph Truett, was currently in the Maury County Jail charged with murder. In an attempt to get him out of jail, she and her husband had called several bonding companies listed in the Maury County telephone book, including Debbie Farris of A-Action Bonding. Mrs. Truett testified that she and her husband were unable to come up with all the money required and that her son told her that his co-defendant, Billy Shouse, had informed him that his (Shouse's) father would help Truett make his bond. According to Mrs. Truett's testimony, her son told her that Billy Shouse said she should call his father and have him meet with Mrs. Farris at the jail to make the arrangements:

_____

[1] We note that the appellant's brief refers to this bail bondsman's last name as "Totty" rather than "Toddy."

[M]y son, when he called me, said that Mr. [Billy] Shouse wanted him to have me call his father and have . . . Mr. Shouse's father meet with Mrs. Farris at the jail because he was going to – Joseph said that Mr. [Billy] Shouse told him that if he got bonded, he would help him get bonded.

Mrs. Truett testified that she conveyed that information to Farris. She said that Farris later called her back to inform her that someone else was in the process of bonding Billy Shouse out and that she would be unable to help with Truett's bond unless Mr. and Mrs. Truett were able to come up with the full amount required. Mrs. Truett testified that she and her husband were the ones who contacted Farris first.

On cross-examination, Mrs. Truett testified that Farris wanted her to give her the Shouses' telephone number so she looked it up in the telephone book and called and spoke with Mrs. Shouse, who was "very upset" and told her that her husband and another relative were at the jail. After that conversation with Mrs. Shouse, she called Farris back. In response to questions by the court, Mrs. Truett testified that when she called Farris back, she informed her that Mr. Shouse was meeting someone at the jail and asked her if she was the person he was meeting. At that point, Farris told her, "[N]o, they already had somebody else over there."

Mrs. Truett further testified that her son told her in her phone conversation with him that Billy Shouse wanted her to call both his father and Debbie Farris of A-Action Bonding. She reiterated that she and her husband initiated all of their conversations with the various bonding companies they contacted in their efforts to get their son out of jail. She said that her son's bond was set at $350,000 and that none of the bonding companies they contacted quoted anything less than $35,000 as the amount they would be required to come up with in order to make the bond.

Roger Truett, Mrs. Truett's husband, testified that after his son called to inform him he was in jail, he contacted all of the bonding companies, including Debbie Farris', in an effort to find one that would help get his son out of jail. In response to questions from the court, Mr. Truett testified that his son told him that Mr. Shouse was "going to try to use Debbie [Farris] and them for a bond" and that Billy Shouse had told him that if he called Mr. Shouse, he would try to "help him out, too, you know, get the bond maybe together." He said he believed that Farris' bonding company was the first one that he called, but he was unable to speak with her and instead left a message before going on to call all the other bonding companies listed in the phone book. He explained that he "just wanted [his son] out" and was "trying to find the cheapest way to get him out[.]" He said that none of the companies he talked with had offered him a discount and that he and his wife were currently "[j]ust trying to come up with some money" to make the bond.

Both Mr. and Mrs. Truett's affidavits were introduced as exhibits at the hearing, as were the affidavits of Debbie Farris and James Bloss.

Debbie Farris testified that she had been a licensed bail bonder for nine and a half years and was employed by A-Action Bonding. On February 6, 2013, she received a telephone call from Mr. Truett, which was interrupted when he had to take another call. He called her back a short time later and they discussed in some depth the nature of bail bonds, where he and his wife worked, and what kind of collateral they owned. From their discussion, she concluded that the Truetts would not be able to make their son's bond at that time. Farris said that she received "a few phone calls that morning" from both Mr. and Mrs. Truett, including one in which they informed her that their son had told them that Mr. Shouse was going to help him make bond, and in which they asked her to go to the jail to speak with him.

Farris testified that, after receiving that phone call from the Truetts, she, Bloss, and another A-Action agent, Lydia Centeno, went to the jail and requested to speak with Billy Shouse. Approximately fifteen minutes later, he was brought to the window. Farris said that the video that was played in court did not contain the full version of the events that transpired that day. She stated that the time that elapsed between her request to speak to Billy Shouse and his arrival at the window was not in the video, nor was her initial conversation in which she informed him she had received a call from the Truetts, who had asked her to see him and who had told her he might be willing to help their son get bonded out of jail, and Shouse's answer of "yes." Further conversation that was left out of the video played in court included conversation surrounding Billy Shouse's comment about having been told that he "couldn't do a property bond":

> And that's – at that point is when Mr. Bloss asked what kind of property he had or how much property, I'm not sure the exact wording. And then on the video I think at that point it might cut off. And then there's some conversation that's left out of the video where he said that they said I couldn't do a property bond. I said, who said you couldn't do a property bond. He said, Toddy's up here on the corner. I said, are you working with another bonding company. He said, well, we've talked to Toddy's and we – I don't think they're going to be able to do it because they want too much money. And I said, well, I said why can you not do a property bond. Because he had previously stated that he and his dad, I believe, owned quite a sum of property. And then I proceeded to explain to him my knowledge of the process of a property bond.

Farris testified that when Billy Shouse told her that they had been working with Toddy's bail bonding company, she turned to Bloss and said that she thought they had been

misled on the bonding company. She said that John Toddy, whose company was named A First, was still actively writing bail bonds in Maury County and was doing so in February 2013, at the time the events in the video transpired. She identified the cell phone records of the telephone calls she and the Truetts exchanged, which were admitted as an exhibit and which, she said, showed that she received two phone calls from Mr. Truett on February 6 and exchanged a total of four calls with Mrs. Truett on February 7. Mrs. Truett first called her at 9:55 a.m. on February 7 to ask her to go to the jail; she called Mrs. Truett back at 10:55 a.m. after leaving the jail to inform her that Billy Shouse had indicated he was working with another bonding company and had asked her to call his father but did not have a valid phone number; Mrs. Truett called her back at 11:02 a.m. after talking to the Shouses to tell her that they were, in fact, working with another bonding company; and Mrs. Truett called her again at 11:57 a.m. to ask if they could still work with them on bonding her son out of jail.

Farris further testified that during her conversation with Billy Shouse, Bloss walked over to the board that listed the bonding companies and their bonding limits and made the comment that Stoney's could only write a $273,000 bond and would obviously have to call in somebody else to write the remaining portion of the bond. She said that the comment that can then be heard about how the "backstabbing" was not going to stop was a reference to a previous unpleasant incident she had had with Scott, who had been terminated from A-Action Bonding Company. In response to questioning by the court, she testified that she went to the jail on February 7 to talk to Billy Shouse about his father making the bonds for both Billy Shouse and Joseph Truett.

In the short portion of her cross-examination testimony that is transcribed, she acknowledged that no one from the Shouse family had approached her about making Shouse's bond. The rest of her cross-examination testimony, as well as the direct and cross-examination testimonies of James Bloss and a defense computer expert, was lost due to the court reporter's having spilled a cup of coffee on her laptop.

Because of the loss of the remaining testimony, both the State and A-Action Bonding submitted statements of the evidence in the case. According to A-Action's statement, Bloss's testimony essentially corroborated Farris' about why they went to the jail and the fact that the video played in court did not contain a full and accurate recording of their conversation with Billy Shouse. Bloss also testified that Nicole Scott was a former employee whom he had fired for not turning in bond premiums. Mitchell E. Davis, the defense's computer expert, testified that he had examined the video clip and concluded that it was not a complete and accurate recording of the events it depicted. Among other things, he testified that the format of the original recording had been changed and re-generated using Windows Movie Maker and that the video had evident starts and stops demonstrated by spectral analysis.

According to the State's statement of the evidence, Bloss admitted that he had been suspended from writing bonds for six months on a prior occasion and that he would have made Billy Shouse's bond for $15,000, which, according to the State, "was less than one-half of what the premium would have been for the original bond." The State also characterizes the evidence at the hearing with the following statement: "Neither Jimmy Bloss nor Debbie Farris ever admitted asking Shouse about making Joe Truett's bond which was the reason they went to the Maury County Jail." We note, however, that, at least with respect to Farris' testimony, this is a misstatement of the evidence, as Farris testified that she spoke with Billy Shouse about making Truett's bond during the first part of her conversation with Shouse, which was not included in Vandiver's cell phone recording.

On May 29, 2013, the Maury County Circuit Court entered an order suspending the bonding authority of A-Action Bonding Company for a period of thirty days, the bonding authority of James Bloss for a period of ninety days, and the bonding authority of Debbie Farris for a period of six months, with the bonding authority of A-Action and Bloss automatically reinstated after their respective suspensions and Farris required to apply for reinstatement at the end of her suspension period. In reaching this decision, the court found that "[t]he most compelling evidence" was the video recording. The court noted that there was "an unfortunate gap of six minutes" in the video and expressed its concerns that "statements that could have been favorable to Bloss and Farris were, for some reason, omitted from the DVD and are no longer available to the Court." The court concluded that fairness mandated that the loss of such evidence reduce its weight and "must result in a significant reduction of any suspension for solicitation[.]" The court further found, however, that it was clear from the video that, despite Bloss's and Farris' awareness that the Shouse family was already working with Stoney's Bail Bonding, Farris tried to persuade Shouse to do business with A-Action instead. The court's order states in pertinent part:

> The most compelling evidence was the video recording which clearly shows Debbie Farris asking Billy Shouse what he could "come up with." Almost immediately, Jimmy Bloss asked Billy Shouse, "How much property have you got?" Then there is an unfortunate gap of six minutes which Mr. Vandiver admits recording from the jail video before it was forever lost by being recorded over seven to ten days later. Mr. Vandiver cannot explain how those six minutes were lost, and the Court is concerned that statements that could have been favorable to Bloss and Farris were, for some reason, omitted from the DVD and are no longer available to the Court.

> Fairness mandates that the loss of such evidence significantly reduces the weight which could otherwise be given to a complete and accurate recording. Such loss also must result in a significant reduction of any

-8-

suspension for solicitation, because Vandiver's loss of critical evidence should not result in him and other competitors getting an undue increase in business during any suspension of A Action.

After the six-minute gap, it is clear from the remaining few minutes of video that Bloss and Farris are aware that Stoney's has been contacted by the Shouse family for making the bond, that Bloss comments that Stoney's does not alone have adequate authority to make Shouse's bond, and that Farris is encouraging Shouse to tell Stoney's that he has changed his mind and decided to do business with A Action.

Farris['] phone records and sworn testimony clearly established that Farris had been contacted by the Truett family about making Truett's bond and w[as] told that Shouse might help finance Truett's bond premium if Shouse himself could make bond. Those communications might have justified A Action contacting Shouse about making a Truett bond but cannot be an excuse for A Action soliciting at the jail the making of the Shouse bond. The Court recognizes that the making of a Truett bond may have been discussed during the six-minute gap in the recording, but that possibility does not excuse or mitigate the obvious and flagrant effort of Debbie Farris to solicit Shouse's bond.

There are significant inconsistencies between the testimony of Farris and Bloss on the one hand and their own affidavits, phone records, and video statements on the other hand. Such inconsistencies sufficiently discredit their testimony and defenses. The prosecution's witnesses are not directly discredited in their testimony, but their reliance upon the video recording as evidence of solicitation is significantly weakened by the failure to preserve a complete and accurate recording.

. . . .

The undersigned judges find that Debbie Farris intentionally solicited Billy Shouse to let A Action make his bond while he was still a prisoner at the jail and after learning that another bonding company had been contacted by the Shouse family and was in the process of making the bond. The undersigned judges also find that Jimmy Bloss had sufficient knowledge of Farris' solicitation efforts and condoned the same.

Both parties filed timely notices of appeal. The State, however, followed with a

request for permission to voluntarily dismiss its appeal on the basis that "there is no vehicle for the State to appeal the judgment of the trial court suspending an appellant's bonding privileges under Tenn. Code Ann. § 40-11-125 and Tenn. R. App. P. 3 (c)[.]" We granted the State's request, and the matter is now before us on the notice of appeal filed by A-Action Bonding Company.

## ANALYSIS

A-Action argues that the trial court committed reversible error by admitting into evidence the altered tape of the conversation at the jail when the original had been destroyed. The State responds by arguing that the appellant has failed to show that the court abused its discretion in admitting the evidence and that the evidence supports the court's decision to suspend the bonding privileges of A-Action, its principal, James Bloss, and its agent, Debbie Farris.

Tennessee Code Annotated section 40-11-125 provides that "approval of a professional bondsman or other surety may be withheld, withdrawn or suspended by any court if, after investigation, it appears that a bondsman . . . [i]s guilty of professional misconduct as described in § 40-11-126." Tenn. Code Ann. § 40-11-125(a)(3) (2010). Tennessee Code Annotated section 40-11-126 provides in pertinent part that

> the following is deemed unprofessional conduct and no bondsman or surety agent shall: . . . [s]olicit business directly or indirectly, by active or passive means, or engage in any conduct which may reasonably be construed as intended for the purpose of solicitation of business in any place where prisoners are confined or in any place immediately surrounding where prisoners are confined[.]

Id. § 40-11-126(6). A bondsman whose authority to write bonds has been revoked or suspended "shall have the right of appeal to the next highest court having criminal jurisdiction, and the appeal shall be heard de novo." Id. § 40-11-125(d).

At the hearing, A-Action objected to the admission of the videotape on the basis of the Tennessee Rules of Evidence, arguing that the altered tape was not a true and accurate depiction of the events it recorded and that its probative value was substantially outweighed by the danger of unfair prejudice. Generally, the admission of evidence is a matter left to the discretion of the trial court, and the trial court's decision will not be disturbed on appeal absent an abuse of discretion. State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party

-10-

complaining.'" State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008) (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

We agree with A-Action that the trial court improperly admitted the videotape as evidence in this case. First, the videotape was neither the original nor an accurate reproduction of the original. Tennessee Rule of Evidence 1002, the "best evidence rule," generally provides that in order to prove "the content of a writing, recording, or photograph, the original writing, recording, or photograph is required." "Stated simply, the underlying theory is that only the best or most accurate proof of written or similar evidence should be admitted, to the exclusion of inferior sources of the same proof, absent some extraordinary justification for the introduction of secondary evidence." Neil P. Cohen et al., Tennessee Law of Evidence § 10.01[2][a] (6th ed. 2011). Although the rules provide for the introduction of a duplicate in place of the original, the cell phone recording of the jail videotape, which all the parties agreed did not contain the full version of the original recording, does not meet the definition of a "duplicate," which is "a copy produced by the same impression as the original . . . or by other equivalent techniques which accurately reproduce the original." Tenn. R. Evid. 1001(4), 1003.

Second, the videotape was not properly authenticated. Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." One manner in which such authentication may occur is by testimony of a witness with knowledge "that a matter is what it is claimed to be." Tenn. R. Evid. 901(b)(1). As explained in Tennessee Law of Evidence:

> There are two common scenarios in which videos are utilized as evidence. The first is the video that constitutes real evidence because it shows the precise event at issue in the case. Examples include the bank camera's video of a robbery, or a home video that unintentionally captures an event which later gives rise to a cause of action, such as a plane crash or automobile accident. To authenticate such evidence, the photographer or one who set up the automatic camera or monitored its tape or video images would be the ideal witness. The authenticating witness should be prepared to show, to the court's satisfaction, that the video accurately portrays what it is presented to prove. This will require the authenticating witness to establish when and where the video was made, under what circumstances, and that it has not been altered in any fashion. Even if the photographer is available, anyone else can authenticate it who can establish that the video produced a true and accurate depiction of the event recorded.

-11-

<u>Tennessee Law of Evidence</u>, § 4.01[22] (6th ed. 2011) (footnote omitted).

As stated previously, the witnesses, including Chief Deputy Johns and Vandiver, agreed that the cell phone recording made by Vandiver was not a full and complete version of the jail recording. Vandiver testified that he was not controlling the jail recording and recorded on his cell phone only what Deputy Johns showed to him. He acknowledged that he lost one portion of the clip he recorded and could not say with certainty whether that was the only portion he lost. Deputy Johns testified that there appeared to be a seven or eight-minute gap on the recording and that he had no way of knowing whether Vandiver recorded on his cell phone every portion of the jail recording that he showed to him. It is, thus, abundantly clear that the cell phone recording did not produce a true and accurate depiction of the events that transpired at the jail that morning.

Third, the probative value of the cell phone videotape was substantially outweighed by the danger of unfair prejudice to the appellants. <u>See</u> Tenn. R. Evid. 403. In its decision to admit the recording, the trial court concluded that the gaps went to its weight rather than its admissibility and that, given the testimony of the appellants with respect to their communication with the inmate, the recording, despite any gaps, was "going to be so important for testing credibility." We respectfully disagree. The recording was not the original, was not a duplicate, and was made by a competitor bail bondsman who, along with some of his staff or quasi-staff, apparently had an acrimonious relationship with the appellants. Most significantly, it was a version of the original recording in which several critical minutes of the initial conversation between Farris and the inmate had been "lost." As such, its probative value for testing the credibility of the witnesses was substantially outweighed by the danger of unfair prejudice to the appellants' case. We conclude, therefore, that the trial court erred in admitting the videotape into evidence.

We further conclude that, without the improperly admitted videotape, there was insufficient evidence to support a finding that the appellants engaged in unprofessional conduct. Absent the videotape, the evidence consisted of the testimony of the witnesses at the hearing and the affidavits submitted as exhibits in the case. From this evidence, it is clear that Farris and Bloss had a conversation with Billy Shouse at the bonding window after Mr. Shouse had, at the very least, begun the process of engaging Stoney's and ABC Bail Bonding to bond Billy Shouse at of jail. What is not clear, however, is exactly what the conversation entailed. According to Farris, Bloss, and the Truetts, they went to the jail at the request of the Truetts, who informed Farris that it was Billy Shouse's request that she speak with him and/or his father about the possibility of his bonding both Shouse and Truett out of jail. This is at least partially corroborated by the testimony of Deputy Johns, who said that it appeared from his viewing of the jail videotape that there was "some confusion" as to which bonding company was "supposed to be there." Although Vandiver testified that he heard no

conversation on the videotape about A-Action bonding Truett out of jail, he also testified that Farris' initial conversation with Billy Shouse, on the portion of the clip that he had lost, was inaudible. In sum, there was insufficient evidence, apart from the improperly admitted videotape, to support a finding that the A-Action agents or principal solicited business at the jail.

## CONCLUSION

Based on the foregoing authorities and reasoning, we reverse the judgment of the trial court and dismiss the motion to suspend the bonding privileges of A-Action Bonding, James Bloss, and Debbie Farris.

_____
ALAN E. GLENN, JUDGE